## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## BEAUMONT DIVISION

**EOD**

08/13/2013

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| **HADLEY COHEN** | § | |
| xxx-xx-0674 | § | Case No. 12-10027 |
| **and MELINDA K. COHEN** | § | |
| xxx-xx-6218 | § | |
| | § | |
| Debtors | § | Chapter 7 |

| | | |
|---|---|---|
| THIRD COAST BANK, SSB | § | |
| | § | |
| Plaintiff | § | |
| | § | |
| v. | § | Adversary No. 12-1004 |
| | § | |
| HADLEY COHEN and | § | |
| MELINDA K. COHEN | § | |
| | § | |
| Defendants | § | |

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

Upon trial of the complaint filed by the Plaintiff, Third Coast Bank, SSB, seeking a determination of whether an alleged debt owed to it by the Defendant-Debtors, Hadley Cohen and Melinda K. Cohen (collectively, the "Defendants"), is dischargeable, the Court issues the following findings of fact and conclusions of law. The Plaintiff contends that the debt is non-dischargeable under the alternative grounds set forth in 11 U.S.C. §523(a)(2)(A) and §523(a)(6). After the trial, the Court took the matter under advisement. This decision disposes of all issues pending before the Court.

# FINDINGS OF FACT

1.  Hadley Furniture, Inc. ("HFI") was a furniture retailer doing business in the Beaumont, Texas area since approximately August 2001.[1]

2.  HFI had enjoyed consistent growth throughout its first years of existence and its sales had been magnified by furniture replacement needs arising from the damage inflicted both by Hurricane Rita in 2005 and by Hurricane Ike in 2008.

3.  Defendant, Hadley Cohen ("Cohen"), managed HFI, served as its president, and owned 49% of the HFI stock.[2]

4.  Cohen possessed 15 years of sales and managerial experience with Conn's Appliances and, in 2001, liquidated his Conn's stock in order to purchase the assets of Long Furniture Co. in the name of HFI.

5.  Defendant, Melinda Cohen, the spouse of Hadley Cohen, owned 51% of the HFI stock and was listed as the treasurer of HFI.[3]  However, Melinda Cohen over the years exercised little, if any, control over the financial affairs of the company, including its relationships with its lenders.

6.  The Defendants also owned a company by the name of Kobee Investments, LLC ("Kobee") that owned real property located at 1036, 1079 and 1096 Calder Avenue, in Beaumont (the "Calder Property").  Kobee leased the Calder Property to HFI for use as warehouse facilities and, in its early years, as its primary retail location.[4]

7.  In its first eight years of existence, HFI had an exclusive banking relationship with Wachovia Bank, N.A. ("Wachovia") or its predecessors-in-interest.[5]

---

[1]  ¶ 3 of the Stipulated Statements of Fact set forth as Exhibit A in the approved Joint Pre-Trial Order entered in this adversary proceeding on June 28, 2013.

[2]  *Id.*

[3]  *Id.*

[4]  ¶ 4 of the Stipulated Statements of Fact; Ex 31.

[5]  This lending relationship actually began with SouthTrust Bank, and was primarily due to the relationship that Long Furniture Co. had with SouthTrust and its predecessor-in-interest, First Bank & Trust.  SouthTrust was subsequently purchased by Wachovia.  The Wachovia interest was procured by Wells Fargo Bank, N.A. in February 2011.  *See* Ex. 74 at p. WF-139.

8.  Prior to May 2009, HFI possessed a revolving line of credit with Wachovia, which was secured by all assets, but primarily by accounts receivables and inventory.[6]

9.  HFI had also executed a promissory note to Wachovia (the "HFI-TI Loan") to finance the tenant improvements at the Calder Property, which was also secured by all assets of HFI, including its accounts receivable and inventory.[7]

10.  Kobee had also executed two promissory notes with Wachovia that were secured by the Calder Property.[8]

11.  The banking relationship between the Defendants and the Plaintiff, Third Coast Bank, SSB ("TCB" or the "Plaintiff") arose from the fact that Scott Adams had been a former loan officer at SouthTrust Bank and was familiar with the HFI operations.  Discussions then began between Scott Adams and Hadley Cohen about possible lending transactions.

12.  The debtor-creditor relationship between the Defendants and TCB actually began in May 2009, when their wholly-owned company, Kobee, refinanced its real estate indebtedness regarding the Calder Property with TCB (the "Kobee Loan").[9]

13.  Kobee borrowed $1,600,000.00 from TCB under a Commercial Real Estate Note,[10] and secured that obligation with a Deed of Trust and other security documents.[11]

14.  The Defendants, as well as HFI, each executed an Unlimited Guaranty in favor of TCB with regard to the financial obligations under the Kobee Loan.[12]

---

[6]  ¶ 5 of the Stipulated Statements of Fact.

[7]  *Id.*

[8]  *Id.*

[9]  ¶ 6 of the Stipulated Statements of Fact.

[10]  Ex. 33.

[11]  Ex. 35.

[12]  Ex. 36-38 and ¶ 6 of the Stipulated Statements of Fact.

15.    Through the closing of the Kobee Loan at TCB, checks to Wachovia were issued in the amounts of $908,977.71 and 234,382.69, respectively, to pay off the Kobee loans at Wachovia.[13]

16.    There was $446,755.64 remaining from the Kobee Loan proceeds following payment of closing costs and the Wachovia indebtedness owed by Kobee.[14]

17.    By engaging in the Kobee Loan transaction, TCB hoped to encourage the Defendants to establish an exclusive banking relationship between HFI and TCB.

18.    It was the hope of TCB that the Defendants, as a prelude to establishing that exclusive banking relationship, would utilize the $446,755.64 in excess proceeds from the Kobee Loan for the benefit of HFI in reducing or retiring the balance of the HFI-TI Loan at Wachovia, although the transaction did not require any such action by the Defendants.[15]

19.    Rather than applying any part of the $446,755.64 to the HFI-TI Loan at Wachovia, the Cohens instead elected at that time to deposit such proceeds into an account at Merrill Lynch in the name of Hadley L. Cohen and Melinda K. Cohen (account #522-12629).[16]

20.    Discussions continued in mid-2009 between Mr. Adams and Mr. Cohen about moving HFI's lending relationships from Wachovia to TCB.  Two offers regarding the establishment of a credit facility for HFI at TCB were rejected by Hadley Cohen.[17]

21.    The parties finally agreed upon the establishment of a $2.6 million credit facility for HFI, with all amounts exceeding $2.2 million being secured by liquid collateral.

---

[13] Ex. 32 and ¶ 7 of the Stipulated Statements of Fact.

[14] *Id.*

[15] It is ironic that TCB apparently expected Cohen to engage in conduct of which it now complains — the diversion of the retained assets of one entity (Kobee) for the benefit of another entity (HFI) — an act that could be construed as one in contravention of the best interests of Kobee and its creditors.

[16] *Id.*

[17] ¶ 8 of the Stipulated Statements of Fact.

22.    The Defendants had previously utilized $400,000 from their Merrill Lynch account to purchase a certificate of deposit in that amount at TCB.[18]

23.    TCB was unaware that the ultimate source of funds for the purchase of the certificate of deposit by the Defendants had been the excess proceeds arising from the earlier Kobee Loan.[19]

24.    The Defendants (at the direction of Cohen) agreed to pledge the $400,000 CD to secure a credit facility of $2.6 million from TCB.

25.    On or about December 31, 2009, TCB funded a revolving line of credit in the amount of $2.6 million to HFI (the "HFI Credit Line").

26.    Specifically, the HFI Credit Line was an asset-based loan under which TCB would advance funds to HFI based upon a borrowing base in an amount equivalent to 75% of HFI's eligible accounts receivable plus 50% of HFI's eligible inventory amounts, up to a maximum amount of $2.6 million.

27.    The HFI Credit Line was designed to satisfy the existing Wachovia indebtedness and to provide some working capital to HFI.[20]

28.    The revolver was documented through the execution of a Promissory Note in the amount of $2.6 million.  The Note was signed solely by Hadley Cohen, in his capacity as president of HFI.[21]

29.    The HFI Credit Line was secured by all assets of HFI as outlined in a Security Agreement.  The Security Agreement was signed solely by Hadley Cohen, in his capacity as president of HFI.[22]

30.    The HFI Credit Line was also secured by the execution of a continuing guaranty agreement by each Defendant.[23]

---

[18]   ¶ 7 of the Stipulated Statements of Fact.

[19]   ¶ 8 of the Stipulated Statements of Fact.

[20]   ¶ 9 of the Stipulated Statements of Fact.

[21]   Ex. 40.

[22]   Ex. 42.

[23]   Ex. 51 and 52.

31.     The transaction to establish the HFI Credit Line was accompanied by the execution of a Business Loan Agreement that further defined the relationship between the parties and outlined the manner in which the credit facility would be established and maintained.[24]

32.     The Business Loan Agreement defined the term "Borrowing Base" as the *lesser* of:
        (1) $2,600,000.00 or

        (2) the sum of 75% of the aggregate amount of Eligible Accounts PLUS 50% of the aggregate amount of Eligible Inventory.[25]

33.     The Business Loan Agreement confirmed that advances to HFI could be made under the HFI Credit Line "provided the aggregate amount of such Advances outstanding at any time does not exceed the Borrowing Base."[26]

34.     In the Business Loan Agreement, HFI, through its president, Hadley Cohen, made a number of representations to TCB including:

        (a)     that the security interests being granted to TCB were "authorized, created and perfected with first lien priority;"[27]

        (b)     with that statement being supplemented by a full paragraph that stated the following:

                **Lien Priority**.  Unless otherwise previously disclosed to Lender in writing, Borrower has not entered into or granted any Security Agreements, or permitted the filing or attachment of any Security Interests on or affecting any of the Collateral directly or indirectly securing repayment of Borrower's Loan and Note, that would be prior or that may in any way be superior to Lender's Security Interests and rights in and to such Collateral.[28]

---

[24]  Ex. 43.

[25]  *Id.* at p. 5-6.

[26]  *Id.* at p. 1.

[27]  *Id.* at p. 1.

[28]  *Id.* at p. 2-3.

(c)    that HFI would maintain its books and records in accordance with GAAP;

(d)    that all financial reports provided to Lender would be "prepared in accordance with GAAP, applied on a consistent basis, and certified by Borrower as being true and correct.[29]

35.    Cohen, acting on behalf of HFI, failed to utilize the new TCB loan proceeds in 2009 to eliminate the indebtedness to Wachovia that had existed since 2007.

36.    At the time of the establishment of the HFI Credit Line with TCB, Cohen, acting on behalf of HFI, knew that he had not utilized the $446,755.64 in excess proceeds from the Kobee Loan to reduce or retire the balance of the HFI-TI Loan at Wachovia.

37.    At the time of the establishment of the HFI Credit Line with TCB, Cohen, acting on behalf of HFI, knew that the HFI-TI Loan at Wachovia was still in existence.

38.    At the time of the establishment of the HFI Credit Line with TCB, Cohen knew that Wachovia had a prior security interest in all assets of HFI to secure the continued payment of the HFI-TI Loan at Wachovia.[30]

39.    At the time of the establishment of the HFI Credit Line with TCB, Cohen knew that HFI had also just given a security interest in furnishings, equipment fixtures, inventory, accounts receivable, and other assets to its landlord, Parkdale Mall, to secure the prompt payment of lease obligations.[31]

40.    Cohen, acting on behalf of HFI, did not disclose to TCB the continued existence of the Wachovia lien or the Parkdale Mall lien to TCB at the time of the establishment of the HFI Credit Line.

41.    Cohen's failure to disclose to TCB the continued existence of any pre-existing liens at the time of the establishment of the HFI Credit Line was intentional, not inadvertent.

---

[29] *Id.* at p. 3.

[30] *See, e.g.*, Ex. 74 at p. WF-66.

[31] Ex. 74 at p. WF-136.

42.  Cohen's failure to disclose to TCB the pre-existing liens at the time of the establishment of the HFI Credit Line was motivated by his desire to obtain the increased line of credit for HFI offered by TCB.

43.  Cohen candidly admitted at trial that he knew, at the time of the establishment of the HFI Credit Line with TCB, that his representation that TCB would be receiving a first priority lien in all assets of HFI to secure the HFI Credit Line was false.

44.  TCB tendered the loan proceeds constituting the HFI Credit Line based upon the express representation of Hadley Cohen, on behalf of HFI, that it would be receiving a first priority lien on all assets from HFI.

45.  Cohen, on behalf of HFI, made the false representations regarding the first priority lien status upon HFI assets with the intention and purpose of deceiving TCB and to induce it to create the HFI Credit Line.

46.  Cohen, on behalf of HFI, made the false representations regarding the first priority lien status upon HFI assets with the intention and purpose of deceiving TCB about its security status.

47.  Any denial by Cohen of the existence of any fraudulent intent on his part is not credible.

48.  Notwithstanding its failure to investigate UCC filings and other sources of information that would have revealed the existence of the competing liens of Wachovia, Parkdale Mall (and perhaps the other encumbrances), TCB justifiably relied upon the false representation of Hadley Cohen that it would be receiving a first priority lien upon all the assets of HFI to secure payment of the HFI Credit Line.

49.  TCB would not have advanced such loan proceeds to HFI in the absence of the false representation.

50.  After the establishment of the HFI Credit Line, and despite his representations regarding TCB's first lien status, Hadley Cohen, acting on behalf of HFI, continued to direct monthly payments from HFI to Wachovia on the HFI-TI Loan at Wachovia.

51.  After the establishment of the HFI Credit Line in December 2009, it was renewed and extended on three occasions — in October 2010,[32] in January 2011,[33] and in May 2011[34].

52.  While the maximum amount available to HFI through the HFI Credit Line was gradually reduced through those subsequent renewals, the documentation for each renewal, and the written representations contained therein, were almost identical to those tendered at the initiation of the line of credit in December 2009.[35]

53.  Upon each such renewal and extension, Hadley Cohen falsely represented to TCB in each respective loan agreement that TCB continued to possess a first priority lien on the assets of HFI.

54.  In addition to the continued concealment of the HFI-TI Loan to Wachovia during the life of the lending relationship with TCB, Cohen also failed to reveal the attachment of other encumbrances known to him including those held by vendors of HFI.

55.  All of these encumbrances created competing payment priorities against portions of the TCB collateral, in derogation of the express representations of Cohen, on behalf of HFI, that TCB would possess a first priority lien on all assets of HFI.[36]

56.  As the HFI Credit Line was renewed and extended at periodic intervals, Hadley Cohen also made additional false representations to TCB.

57.  Such additional false representations by Cohen, issued in each instance after the creation of the HFI Credit Line, were made in an effort to preserve the existence and amount of the HFI Credit Line at TCB.

---

[32]  Ex. 45-47.

[33]  Ex. 53-55.

[34]  Ex. 48-50.

[35]  One significant addition occurred in January 2011 when the Business Loan Agreement was supplemented to restrict HFI officer compensation to $20,000 per calendar quarter.  *See* Ex. 55 at p. 5.

[36]  ¶ 16 of the Stipulated Statements of Fact.

58. During the lending relationship, Cohen knowingly tendered false HFI financial statements to TCB.[37]

59. During the lending relationship, from February 2010 to August 2011, HFI, at Cohen's direction, transferred cash assets of $285,000.00 into its Merrill Lynch account.[38]

60. During the lending relationship, Cohen concealed significant amounts of HFI cash that was being diverted on a monthly basis to cover personal expenditures, primarily through the use of the corporate American Express account of HFI.[39]

*Borrowing Base Certificates*

61. At various times during the lending relationship, Cohen also made false representations to TCB with regard to the submission of borrowing base certificates.

62. The authorized lending limits under the HFI Credit Line technically fluctuated each day based upon the inventory and receivable levels at any given time.

63. As an asset-based loan, TCB could require HFI to submit a "Borrowing Base Certificate" as a tool to ensure that HFI did not exceed the borrowing base.

64. In a Borrowing Base Certificate, HFI would certify to TCB the amount of eligible accounts receivable and eligible inventory existing at a particular moment in time.

65. Generically, borrowing base certificates are often utilized in this type of asset-based loan in order to allow a bank to exercise oversight over the shifting loan balance, thereby seeking to control the risk that the bank might advance more money than allowed under the loan facility.

---

[37] Ex. 1-2. The financial statements did not accurately reflect the debt owed by HFI, the level of inventory or of collectible accounts, nor reveal the withdrawals taken by the equity owners. These are germane, however, only to demonstrate Cohen's intention to conceal the eroding financial condition of HFI since TCB, through prior counsel, failed to allege any cause of action under §523(a)(2)(B) of the Bankruptcy Code.

[38] Ex. 103 and ¶ 23 of the Stipulated Statements of Fact. Cohen transferred $10,000 per month from February to July 2010, $15,000 per month from August 2010 to February 2011, and $20,000 per month from March 2011 until the filing of the HFI bankruptcy petition in August 2011. The HFI bankruptcy schedules in August 2011 would reveal a Merrill Lynch balance of only $216.00.

[39] Ex. 70 and 80.

66.    In this instance, the figures contained in the Borrowing Base Certificate, when combined with the pledged CD amount, would yield: (1)  the maximum amount of borrowed funds authorized under the HFI Credit Line;  and (2) identify any amount of funds that were available but not currently utilized by the borrower.

67.    If any Borrowing Base Certificate revealed that the amount of funds that had been advanced to HFI under the credit line exceeded the borrowing base, TCB could, at a minimum, immediately demand repayment of the amount in excess of the borrowing base in order to bring the loan back into compliance.[40]

68.    Despite their usefulness, TCB utilized this process only on a sporadic basis.

69.    In connection with the HFI Credit Line, Hadley Cohen caused to be delivered to TCB borrowing base certificates from HFI on eight different occasions during the lending relationship.[41]

70.    In reverse chronological order, the borrowing base certificates represented the HFI collateral base to be as follows:[42]

| Date of BBC | A/R Balance | Total Inventory |
|---|---|---|
| June 1, 2011 | $1,474,797.84 | $2,451,336.01 |
| April 11, 2011 | $1,958,044.72 | $2,688,555.45 |
| February 22, 2011 | $1,724,050.92 | $2,586,084.57 |
| December 31, 2010 | $1,272,027.77 | $2,436,481.63 |
| September 15, 2010 | $1,496,861.20 | $2,597,764.44 |
| May 1, 2010 | $1,366,884.00 | $2,577,158.56 |
| March 16, 2010 | $835,816.60 | $2,649,898.52 |
| December 31, 2009 | $1,201,238.70 | $2,496,828.79 |

---

[40]  Ex. 43 at p. 1.

[41]  Ex. 56-63 (in reverse chronological order) and ¶¶ 11 & 13 of the Stipulated Statements of Fact.

[42]  *Id.*

71.    Each Borrowing Base Certificate contained the following language:

> The undersigned hereby certify that (a) the information and calculation set forth above are true, complete and correct as the dates indicated, and may be relied upon by Bank as a basis for advancing any credit to Borrower, (b) such computations have been made in full compliance with the terms of the Loan Agreement, (c) the representations and warranties of Borrowers under the Loan Agreement are true and correct as of the date first set forth above, and (d) no default or event of default has occurred under ·the Loan Agreement or any of the documents, instruments or agreements executed in connection therewith.[43]

72.    Despite the certification language contained in each Borrowing Base Certificate, only four of the eight Borrowing Base Certificates were actually signed by Cohen.

73.    However, it is uncontested that all eight Borrowing Base Certificates, and the misinformation contained therein, were tendered to TCB with the approval, and at the direction, of Hadley Cohen.

74.    Each Borrowing Base Certificate tendered after the inception of the HFI Credit Line contained misrepresentations by Hadley Cohen, acting on behalf of HFI, regarding: (a)  the total amount of eligible inventory;[44] and (b) the total amount of eligible accounts receivable,[45] each of which Cohen knew was an inflated, erroneous figure in each instance.

75.    Cohen directed the submission of the erroneous Borrowing Base Certificates to TCB for the purpose of maintaining the existing borrowing base and to conceal from TCB the eroding financial circumstances of HFI.

---

[43]  ¶ 11 of the Stipulated Statements of Fact.

[44]  For example, the June 1, 2011 Borrowing Base Certificate indicated an inventory value of $2,451,336.01, when, in less than three months, an independent inventory apprisal would reveal a value of only $897,151.20.  *See* ¶18 of the Stipulated Statements of Fact.  In fact, HFI had not conducted an actual physical inventory count since the last quarter of 2004. *See* ¶14 of the Stipulated Statements of Fact.  Further, Cohen compromised the internal financial reporting for HFI by implementing procedures so that an item of furniture sold on credit would remain in the inventory count, even though it was appropriately scheduled as an eligible account receivable.

[45]  An account lost its "eligibility" for the borrowing base calculation if it was not paid in full within 90 days of the invoice date.  See the various versions of the Business Loan Agreement.  Ex. 12, 43, 47, 50, and 55.

**-12-**

76.    All of the false representations that were made by Cohen during the existence of the HFI-TCB lending relationship,[46] though obviously serious and debilitating to TCB, nevertheless related not to the existence of the debt, but rather to TCB's ongoing ability to protect itself from a significant financial loss.

77.    In other words, they were actions that Cohen took on behalf of HFI that fraudulently induced TCB to forbear the use of available remedies that might have otherwise been exercised had the actual financial condition of HFI been disclosed.

78.    It is true that a fraudulently-induced forbearance may constitute an extension or renewal of credit for the purposes of §523(a)(2). *Ojeda v. Goldberg*, 599 F.3d 712, 718 (7th Cir. 2010); *Field v. Mans*, 157 F.3d 35, 43-46 (1st Cir. 1998).

79.    The false representations tendered to TCB by Cohen during the lending relationship were justifiably relied upon by TCB.[47]

80.    However, TCB has failed to demonstrate by a preponderance of the evidence that its collection remedies actually lost value during the forbearance period as a result of the misrepresentations of Cohen.

81.    Given the inflated borrowing base and the existence of the prior encumbrances upon the components of that base, the record fails to establish that the recovery prospects of TCB as against its collateral worsened during the forbearance period because of the false representations of Hadley Cohen.

82.    Even if a worsened condition was demonstrated, the record certainly fails to contain sufficient chronological detail for the Court to determine the degree to which TCB suffered any *additional* damages as a result of the false representations of Hadley Cohen that occurred in the forbearance period.

---

[46]   These would include misrepresentations contained in the Borrowing Base Certificates, the undisclosed conflicting liens, the undisclosed diversions of corporate assets, his undisclosed bankruptcy filing in 1998, and other false financial information submitted to TCB by Hadley Cohen on behalf of HFI.

[47]   *Id.*

**-13-**

*Melinda K. Cohen*

83.     Although she was an officer of HFI, and while she may have occasionally fulfilled limited clerical roles at the store when called upon, Defendant Melinda K. Cohen played no significant role in the operations of the business affairs of HFI.

84.     Mrs. Cohen is essentially a homemaker.

85.     Mrs. Cohen left virtually all of the business decision-making as well as her personal financial affairs to her spouse, Hadley Cohen.

86.     Mrs. Cohen did not negotiate with TCB (or any other creditor) on behalf of HFI.

87.     Mrs. Cohen made no written representation to TCB on behalf of HFI.

88.     While her signature may appear on various supporting documents as may have been necessary to initiate or maintain the HFI Credit Line at TCB, Mrs. Cohen did not participate in the loan negotiations between HFI and TCB, had no substantive knowledge concerning them, nor did she have any personal knowledge of the representations contained in the loan documents between those parties.

89.     The most accurate inference arising from the evidence is that Mrs. Cohen simply signed financial documents at the instruction of her spouse.

90.     That inference applies to the personal guaranty that Mrs. Cohen gave to TCB.[48]  It applies to the preparation and presentation of the couple's joint tax returns.  It applies to any personal financial information that may have been tendered by HFI or Hadley Cohen to TCB.

91.     It is certainly clear that Mrs. Cohen utilized the corporate American Express card for personal expenses, but the means and methodology by which the monthly statements were paid for that American Express account, as well as any other issue regarding the use of HFI assets, were handled solely by her spouse, Hadley Cohen.

92.     While she may have made certain representations to TCB through the submission of various financial documents that she was asked to sign, TCB has failed to present sufficient credible evidence that Defendant Melinda K. Cohen made any such representations with a fraudulent intent.

---

[48]  Ex. 16.

**-14-**

93.     TCB has failed to establish by a preponderance of the evidence that Defendant Melinda K. Cohen made representations to TCB that such Defendant knew were false at the time that such representations were made.

94.     TCB has failed to establish by a preponderance of the evidence that Defendant Melinda K. Cohen made false representations to TCB with the intention and purpose of deceiving TCB.

95.     TCB has failed to establish by a preponderance of the evidence that Defendant Melinda K. Cohen participated in the securing of funds for HFI from TCB with a fraudulent intent.

96.     TCB has failed to present sufficient credible evidence that Defendant Melinda K. Cohen was a knowing and active participant in any fraudulent activity otherwise perpetrated by Hadley Cohen.

97.     TCB has failed to present any credible evidence that, at the time that the debt was created, Defendant Melinda K. Cohen acted with the specific subjective intent to cause injury to TCB.

98.     TCB has failed to present any credible evidence that, at the time that the debt was created, any action of Defendant Melinda K. Cohen created an objective substantial certainty of harm to TCB.

*Damages*

99.     On August 29, 2011, HFI filed a voluntary petition for relief under Chapter 7 of the Bankruptcy Code (the "Petition Date") and TCB began the process of seeking to realize upon the collateral securing the HFI Credit Line.  TCB also began to learn the truth regarding the financial structure of HFI.

100.    The outstanding balance on the HFI Credit Line on the Petition Date was $2,197,278.94.

101.    After some procedural wrangling, the inventory of HFI was sold for $500,000.00.[49]

---

[49] Ex. 28.

-15-

102.   Upon the sale of the HFI inventory, Wells Fargo Bank asserted its first lien position in that inventory to secure existing indebtedness.[50]

103.   TCB was compelled to satisfy the payment demand by Wells Fargo based upon its senior lien position for the negotiated sum of $335,000.00.[51]

104.   TCB was compelled to forward to CBL Properties (HFI's landlord at the Parkdale Mall) the negotiated sum of $85,000 in satisfaction of its senior lien position as to the HFI inventory.[52]

105.   After other costs and payments, TCB actually recovered only $86,906.37 from the sale of the inventory, and an additional $3,300.00 from the sale of equipment.

106.   After the Petition Date, TCB recovered accounts receivable of $266,371.87 (from Universal accounts), $28,101.75 (from Duvera accounts), and $11,865.51 from the pre-dated checks of customers.

107.   Thus, the amount actually recovered by TCB from the sale of its collateral after the Petition Date was $426,416.77, resulting in a net deficiency indebtedness amount of $1,770,862.17.

108.   Interest continues to accrue at the contract rate of 5.5%, with a per diem accrual of $270.55.

109.   Thus, TCB has suffered financial losses as a direct and proximate cause of its reliance upon the false representations of Hadley Cohen, in the total amount of $1,989,141.57.[53]

110.   Certainly the obligations arising under the respective guaranty agreements of the Defendants have been breached, thereby creating a debt for which each Defendant

---

[50]   ¶ 20 of the Stipulated Statements of Fact.  Indeed, Hadley Cohen had executed renewal documents with Wells Fargo two months before the HFI Petition Date. Ex. 74 at WF-76.

[51]   *Id.*

[52]   *Id.*

[53]   TCB has chosen to forego the submission of any damage claim for attorney's fees or for any deficiency arising from the Kobee loan.

is personally liable, subject to the effect of the discharge injunction entered in the underlying Chapter 7 case.

111.   The Defendants filed a joint petition for relief under Chapter 7 of the United States Bankruptcy Code on January 10, 2012.

112.   TCB timely filed its Complaint to Determine Dischargeability of Debt on February 24, 2012, seeking to except its claim from the scope of any discharge granted to either of the Defendants pursuant to 11 U.S.C. §523(a)(2)(A) and §523(a)(6).

113.   To the extent any of these findings of fact constitute conclusions of law, the Court expressly adopts them as such.

## CONCLUSIONS OF LAW

1.   This Court has subject matter jurisdiction under 28 U.S.C. §§1334 and 11 U.S.C. §523.  This Court has personal jurisdiction over the parties to this adversary proceeding.

2.   This Court has authority to enter a final judgment in this adversary proceeding since it statutorily constitutes a core proceeding as contemplated by 28 U.S.C. §157(b)(2)(I) and (O) and meets all constitutional standards for the proper exercise of full judicial power by this Court.

3.   This Court has the authority to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case.  *Morrison v. Western Builders (In re Morrison)*, 555 F.3d 473, 478–79 (5th Cir. 2009).

4.   Such authority recognized in the Fifth Circuit is consistent with decisions of sister courts of appeal.  *See, e.g., Cowen v. Kennedy (In re Kennedy)*, 108 F.3d 1015, 1017–18 (9th Cir.1997); *Longo v. McLaren (In re McLaren)*, 3 F.3d 958, 965–66 (6th Cir.1993); *Abramowitz v. Palmer*, 999 F.2d 1274 (8th Cir.1993); *N.I.S. Corp. v. Hallahan (In re Hallahan)*, 936 F.2d 1496, 1508 (7th Cir.1991).

5.   The recognized authority of a bankruptcy court to enter a final judgment on an unliquidated claim when determining the dischargeability of that debt in a bankruptcy case was not impaired by the decision in *Stern v. Marshall*, ⸺ U.S. ⸺, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011).  *Farooqi v. Carroll (In re Carroll)*, 464 B.R. 293, 312 -313 (Bankr. N.D. Tex. 2011); *Dragisic v. Boricich (In re Boricich)*, 464 B.R. 335, 337 (Bankr. N.D. Ill. 2011).

-17-

6.      Even if *Stern* had arguably impacted that authority [which it did not],

> the court would be compelled to follow existing Fifth Circuit precedent as set out in *Morrison* . . . as this court cannot ignore (much less 'overrule') existing binding circuit precedent, even if that precedent is thought to be inconsistent with a later decision by the Supreme Court. Only the circuit itself can overrule its own precedents.

*Christian v. Kim (In re Soo Bin Kim)*, 2011 WL 2708985, at *2 n.2 (Bankr. W.D. Tex., July 11, 2011), as cited in *Carroll*, 464 B.R. at 313 and *Dietz v. Ford (In re Deitz)*,  469 B.R. 11, 21 (B.A.P. 9th Cir. 2012).

7.      The complaint filed by TCB seeks a determination that the debt which it alleges is owed to it by the respective Defendants should be excepted from discharge under 11 U.S.C. §523(a)(2)(A) and §523(a)(6).

8.      In seeking to except the debt owing to it from the scope of the discharge granted to each Debtor-Defendant, TCB assumes the burden of proof under a preponderance of the evidence standard.  *Grogan v. Garner*, 498 U.S. 279, 286 (1991).

9.      All exceptions to discharge under §523 "must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start."[54]  *Hudson v. Raggio & Raggio, Inc. (In re Hudson)*, 107 F.3d 355, 356 (5th Cir. 1997).

10.    However, the Fifth Circuit has noted that there are limits to the maxim that exceptions to dischargeability are to be construed narrowly in favor of the debtor, particularly in situations falling under an exception to dischargeability in a case in which a debtor has committed fraud. *See generally Deodati v. M.M. Winkler & Associates (In the Matter of: M.M. Winkler & Associates),* 239 F.3d 746, 751 (5th Cir. 2001).

---

[54]  However, a fresh start is not promised to all who file for bankruptcy relief, but only to "the honest but unfortunate debtor."  *Grogan*, 498 U.S. at 286-87.

*Nondischargeability Under 523(a)(2)(A):  Debt Arising*
*by Fraud, False Pretenses, or False Representation.*

11.    The Plaintiff's Complaint seeks a determination that the debt owed to it should be excepted from discharge under §523(a)(2)(A) as a debt obtained by false pretenses, a false representation or actual fraud.

12.    11 U.S.C. §523(a)(2)(A) of the Bankruptcy Code provides that:

> a discharge under §727 of this title does not discharge an individual debtor from any debt for money, property, or services, . . . to the extent obtained by false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

13.    Section 523(a)(2)(A) encompasses similar but distinct causes of action.  Though other circuits have applied a uniform standard to all § 523(a)(2)(A) actions,[55] the Fifth Circuit has distinguished the elements of "actual fraud" and of "false pretenses and false representations."  *RecoverEdge L.P. v. Pentecost*, 44 F.3d 1284, 1291 (5th Cir. 1995).

14.    The distinction recognized by the Fifth Circuit appears to be a chronological one, resting upon whether a debtor's representation is made with reference to a future event, as opposed to a representation regarding a past or existing fact. *Bank of La. v. Bercier (In re Bercier)*, 934 F.2d 689, 692 (5th Cir.1991) [A debtor's promise . . .  related to a future action which does not purport to depict current or past fact . . . therefore cannot be defined as a false representation or a false pretense].

---

[55] *See, e.g., Britton v. Price (In re Britton)*, 950 F.2d 602, 604 (9th Cir. 1991); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987).  Though some bankruptcy courts outside of the Fifth Circuit have cited the decision of the United States Supreme Court in *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351(1995), in support of their proposition that all of the §523(a)(2)(A) actions are governed by the elements for actual fraud, *see, e.g., AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326 (Bankr. W.D. Mo. 1997); *AT& T Universal Card Services v. Alvi (In re Alvi)*, 191 B.R. 724 (Bankr. N.D. Ill. 1996); the Supreme Court in that case was actually distinguishing the language used in §523(a)(2)(A) from that utilized in §523(a)(2)(B) in order to determine the degree of reliance necessary above mere reliance in fact in order to exempt a debt from discharge under (a)(2)(A).  Since the Supreme Court specifically refused to even apply their direct holding regarding the degree of  reliance in actual fraud cases to cases of false pretense or false representation, 116 S.Ct. at 443, n. 8, the statement that the Court erased all distinctions between the three (a)(2)(A) actions is, at best, inaccurate.

15.   To have a debt excepted from discharge pursuant to the "actual fraud" provision in § 523(a)(2)(A), an objecting creditor must prove that:

>   (1) the debtor made representations;
>   (2) at the time they were made the debtor knew they were false;
>   (3) the debtor made the representations with the intention and purpose to deceive the creditor;
>   (4) the creditor justifiably relied on such representation; and
>   (5) the creditor sustained losses as a proximate result of the representations.

*Pentecost*, 44 F.3d at 1293, *as modified by the United States Supreme Court decision of Field v. Mans*, 516 U.S. 59 (1995) [regarding the proper standard of reliance].

16.   A debt may also be declared non-dischargeable if it was obtained by false pretenses or by a false representation.  While "false pretenses" and "false representation" both involve intentional conduct intended to create and foster a false impression, the distinction is that a false representation involves an express statement, while a claim of false pretenses may be premised on misleading conduct without an explicit statement. *See FNFS, Ltd. v. Harwood (In re Harwood),* 404 B.R. 366, 389 (Bankr. E.D. Tex. 2007); *Wallace v. Davis (In re Davis)*, 377 B.R. 827, 834 (Bankr. E.D. Tex. 2007).

17.   In order for a debtor's representation to constitute a false pretense or a false representation, it "must have been: (1) [a] knowing and fraudulent falsehood, (2) describing past or current facts, (3) that [was] relied upon by the other party."[56] *RecoverEdge L.P.* at 1292-93; *Allison v. Roberts (In re Allison)*, 960 F.2d 481, 483 (5th Cir. 1992); *see also In re Bercier*, 934 F.2d at 692 ["to be a false representation or false pretense under § 523(a)(2), the false representations and false pretenses must encompass statements that falsely purport to depict current or past facts"].

18.   All substantive aspects of § 523(a)(2)(A) are triggered by this complaint.

---

[56]   Though the Supreme Court in *Field v. Mans* avoided a determination of the degree of reliance required in a false pretense or false representation case, it is reasonable to assume that justifiable reliance, in addition to reliance in fact, is the correct level of reliance required to sustain a finding of nondischargeability in a false pretense or false representation case.  *In re Hernandez*, 208 B.R. 872, 876 n.4 (Bankr. W.D. Tex. 1997).

19.    "A party may justifiably rely on a misrepresentation even when he could have
ascertained its falsity by conducting an investigation." *Sanford Institution for
Savings v. Gallo*, 156 F.3d 71, 74 (1st Cir. 1998).

20.    "Justifiable reliance requires proof that a plaintiff *actually relied* upon the
defendant's false representations and that such reliance was justified under the
circumstances." *First Horizon Home Loan Corp. v. Apostle (In re Apostle)*, 467
B.R. 433, 443 (Bankr. W.D. Mich. 2012) (emphasis in original).

21.    "Justifiable reliance is a less demanding standard than reasonable reliance." *First
American Title Ins. Co. v. Lett (In re Lett)*, 238 B.R. 167, 186 (Bankr. W.D. Mo.
1999).

22.    It incorporates "the qualities and characteristics of the particular plaintiff, and the
circumstances of the particular case, rather than of the application of a community
standard of conduct in all cases." *Field*, 516 U.S. at 70-71.

23.    "The justifiable reliance standard imposes no duty to investigate unless the falsity
of the representation is readily apparent or obvious or there are 'red flags'
indicating such reliance is unwarranted." *Manheim Automotive Financial Svcs.,
Inc. v. Hurst (In re Hurst)*, 337 B.R. 125, 133-34 (Bankr. N.D. Tex. 2005).

24.    However, a plaintiff "may not blindly rely upon a misrepresentation, the falsity of
which would be obvious to the plaintiff had he or she used her senses to make a
cursory examination or investigation.  Only where, under the circumstances, the
facts should be apparent to a person of the plaintiff's knowledge or intelligence
from a cursory glance, or where the plaintiff has discovered something that should
serve as a warning that he is being deceived, is the plaintiff required to make an
investigation of his own." *Baker v. Sharpe (In re Sharpe)*, 351 B.R. 409, 423
(Bankr. N.D. Tex. 2006).

25.    "Justifiable reliance turns upon the plaintiff's own capacity and knowledge, or the
knowledge with which the plaintiff may be fairly charged to have from the facts
within his or her observation in light of his or her individual case." *Id.* (internal
citation omitted).

26.    TCB failed to plead a cause of action under §523(a)(2)(B) under which a debt
obtained by a materially false written statement concerning a debtor's or insider's
financial condition.

27.     Nevertheless, a recovery by TCB under §523(a)(2)(A) for the false representations or false pretenses of Cohen contained in the Borrowing Base Certificates is not legally precluded — nor is any heightened reliance standard applicable — because the Borrowing Base Certificate utilized in this case does not qualify as a "statement  . . . respecting the debtor's financial condition," that would otherwise be governed by §523(a)(2)(B).[57]

28.     A fraudulently-induced forbearance may constitute an extension or renewal of credit for the purposes of §523(a)(2).  *Ojeda v. Goldberg*, 599 F.3d 712, 718 (7th Cir. 2010); *Field v. Mans*, 157 F.3d 35, 43-46 (1st Cir. 1998); and cases cited therein.

29.     "In determining whether a forbearance is fraudulently induced, the creditor must prove that (1) it had valuable collection remedies at the time of the misrepresentation, (2) it did not exercise those remedies based upon the misrepresentation, and (3) that the remedies lost value during the extension period."  *Ojeda*, 599 F.3d at 719.

30.     As to Mrs. Cohen, a debt may be determined to be non-dischargeable for fraud as to an innocent debtor based upon a spouse's fraudulent conduct when imputed under agency principles based upon a business relationship between the spouses. *Tummel & Carroll v. Quinlivan (In re Quinlivan)* 434 F.3d 314, 318 (5th Cir. 2005), *Luce v. First Equip. Leasing Corp. (In re Luce)*, 960 F.2d 1277, 1282 (5th Cir. 1992).

31.     However, any fraud perpetrated by one spouse cannot be properly imputed to the other spouse based solely upon the existence of a marital relationship.  *Tower Credit, Inc. v. Gauthier (In re Gauthier)*, 349 Fed. App'x. 943, 945 (5th Cir. 2009).

32.     "This circuit imputes fraud to debtors only if the fraudulent representations were made by a formal partner or agent.  The relationship between the parties is analyzed under state law."  *Quinlivan,* 434 F.3d at 319.

---

[57]   The Fifth Circuit has adopted the "strict" view of the operative phrase of §523(a)(2)(B), declaring that the term "financial condition" means "the general overall financial condition of an entity or individual, that is, the overall value of property and income as compared to debt and liabilities."  *Bandi v. Becnel (In re Bandi),* 683 F.3d 671, 676 (5th Cir. 2012).

33.    Under Texas law, "a director or officer of a corporation is not liable, merely because of his official character, for the fraud or false representations of the other officers or agents of the corporation . . . if such director or officer is not personally connected to the wrong and does not participate in it." *K&G Oil Tool & Svc. Co. v. G & G Fishing Tool Svc.*, 158 Tex. 594, 611, 314 S.W.2d 782, 793 (1958). *Accord, Permian Petroleum Co. v. Barrow*, 484 S.W.2d 631, 634 (Tex. Civ. App. – El Paso 1972, no writ); *Arango v. Davila*, 2011 WL 1900189, at *5 (Tex. App. – Corpus Christi, May 19, 2011, pet. denied) ["[A]n officer or agent of a corporation is always primarily liable for her own torts . . . but she cannot be held liable for a wrong in which she has not participated."].

34.    It is widely recognized that "[a] promise to perform acts in the future is not a qualifying misrepresentation merely because the promise subsequently is breached." *Woo, Inc. v. Donelson (In re Donelson)*, 410 B.R. 495, 503 (Bankr. S.D. Tex. 2009) (citing *Allison,* 960 F.2d at 484). A breach of contract "is not sufficient to make a debt non-dischargeable, even though there is no excuse for the subsequent breach." *Turbo Aleae Inv., Inc. v. Borschow (In re Borschow)*, 454 B.R. 374, 395 (Bankr. W.D. Tex. 2011)(citing *Bercier*, 934 F.2d at 692).


*Nondischargeability Under §523(a)(6):*
*Debt Arising from Willful and Malicious Injury*


35.    TCB further contends that the debt owed to it by Defendant Melinda K. Cohen should be excepted from discharge as a debt arising from a willful and malicious injury inflicted upon it by the Debtor-Defendant.[58]

36.    Section 523(a)(6) of the Bankruptcy Code provides that:

(a) A discharge under Section 727 . . . of this title does not discharge an individual debtor from any debt . . .

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity.

---

[58] Because the debt owed to TCB by Hadley Cohen is non-dischargeable under §523(a)(2)(A), the Court need not reach the issues and arguments presented with respect to the alleged nondischargeability of the debt owed by Hadley Cohen as a willful and malicious injury under §523(a)(6).

-23-

37.   In *Kawaauhau v. Geiger*, 523 U.S. 57 (1998), the United States Supreme Court significantly narrowed the scope of debts that could be deemed nondischargeable under §523(a)(6).

38.   The *Geiger* decision clearly requires that an actor inflict a deliberate or intentional injury, not merely that an actor take a deliberate or intentional act that leads to injury.

39.   As subsequently interpreted by the Fifth Circuit, a recovery under §523(a)(6) for a "willful and malicious injury" now requires proof that such injury arose from a deliberate and intentional act by a debtor that was inflicted under circumstances evidencing either: (1) an objective substantial certainty of harm; or (2) a subjective motive to cause harm.  *Miller v. J. D. Abrams, Inc. (In re Miller)*, 156 F.3d 598, 606 (5th Cir. 1998), *cert. denied, Miller v. J.D. Abrams, Inc.*, 526 U.S. 1016 (1999);  *see also Caton v. Trudeau (In re Caton),* 157 F.3d 1026, 1029 (5th Cir. 1998).

40.   The "objective substantial certainty" prong "is a recognition of the evidentiary reality that defendants rarely admit malicious intent.  A court is thus expected to analyze whether the defendant's actions, which from a reasonable person's standpoint were substantially certain to cause harm, are such that the court ought to infer that the debtor's subjective intent was to inflict a willful and malicious injury on the plaintiff." *Mann Bracken, LLP v. Powers (In re Powers)*, 421 B.R. 326, 334-35 (Bankr. W.D. Tex. 2009), *citing In re Vollbracht*, 276 Fed. App'x. 360 (5th Cir. 2007).

41.   TCB has failed to demonstrate by a preponderance of the evidence the existence of a deliberate or intentional injury inflicted upon it by Defendant Melinda K. Cohen, and it has additionally failed to demonstrate by a preponderance of the evidence that the actions of such Defendant created an objective substantial certainty of harm to them.

42.   Thus, TCB has failed to sustain its burden of proof that any purported debt owed to it by Defendant Melinda K. Cohen arose from a "willful and malicious injury" as contemplated by §523(a)(6).

## <u>CONCLUSION</u>

1.  It can be said with confidence that TCB would have discovered the pre-existing liens on the HFI property and have been in a position to protect its own financial interests, had it simply exercised proper due diligence and conducted a thorough lien search while contemplating the creation of the HFI credit facility.

2.  That simple action would likely have precluded the damages suffered by TCB in this case, either through its denial of the proposed credit facility for HFI in toto or through a heightened scrutiny to ensure that, if the loan was made, TCB would actually possess a first priority lien on the relevant assets.  However, for unexplained reasons, its personnel did not take such a prudent and expected action.

3.  Nevertheless, TCB is entitled to a determination of non-dischargeability against Hadley Cohen because its reliance upon his knowingly false representations was justifiable.  It need not have proven that it acted with ordinary prudence and care.

4.  Though at first glance this result may seem harsh, particularly given the commercial sophistication of the Plaintiff, the rationale for such a policy is sound. As the First Circuit Court of Appeals has articulated:

>   The rationale for placing this relatively low burden on the victim of the misrepresentation is rooted in the common law rule that the victim's contributory negligence is not a defense to an intentional tort.  In such circumstances, the equities weigh in favor of giving the benefit of the doubt to the victim, careless as it may have been, and even though it could have been more diligent and conducted an investigation. . . . This pragmatic rule of conduct is at the heart of millions of commercial transactions conducted daily in this nation which rely on the honesty and truthfulness of representations made by the parties.

    *Gallo*, 156 F.3d at 74-75.

5.  For the reasons set forth herein, the Plaintiff, Third Coast Bank, SSB, shall recover from Defendant, Hadley Cohen, the sum of $1,989,141.57, together with post-judgment interest upon such sums at the current federal post-judgment interest rate of 0.12% until paid.  Such indebtedness is declared to be non-dischargeable pursuant to 11 U.S.C. §523(a)(2)(A).

-25-

6.      Because the Court concludes that TCB has failed to prove by a preponderance of the evidence that the debt owed by Defendant, Melinda K. Cohen, was procured by false representations, false pretenses or actual fraud, judgment must be rendered for Defendant Melinda K. Cohen under §523(a)(2)(A).

7.      Because the Court concludes that TCB has failed to prove by a preponderance of the evidence that the debt owed by Defendant, Melinda K. Cohen, arose from the infliction of a willful and malicious injury, judgment must be rendered for Defendant Melinda K. Cohen under §523(a)(6).[59]

8.      All other relief requested in the TCB's Complaint in the above-referenced adversary proceeding shall be denied.

9.      To the extent any of these conclusions of law constitute findings of fact, the Court expressly adopts them as such.

10.     An appropriate judgment shall be entered consistent with these findings and conclusions.

Signed on 08/13/2013

THE HONORABLE BILL PARKER
UNITED STATES BANKRUPTCY JUDGE

---

[59]  Since all amounts of the contractual indebtedness otherwise owed by Defendant, Melinda K. Cohen, to the Plaintiff has been discharged, it shall not be referenced as a recovery in the judgment issued in this adversary proceeding.